[No. C072621. Third Dist. July 20, 2015.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE RODOLFO RIVAS, Defendant and Appellant.
THE PEOPLE, Plaintiff and Respondent, v.
AARON ANTHONY VALADEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through VIII.

COUNSEL

Law Office of Donald Masuda, Donald Masuda and Kenny N. Giffard for Defendant and Appellant Jose Rodolfo Rivas.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Aaron Anthony Valadez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

NICHOLSON, J.—Defendants Jose Rodolfo Rivas and Aaron Anthony Valadez participated with other Norteño gang members in an attack on Osvaldo Hernandez and Victor Arechiga. Gang members stole beer that Arechiga had just purchased. After the beer had been taken, defendant Valadez trapped Hernandez in the driver's seat of Hernandez's car while defendant Rivas reached in from the passenger side and slashed Hernandez's face. Hernandez identified defendant Rivas as the one who slashed him, and defendant Valadez was identified as a participant in the attack by his palm print found on the driver's side window of Hernandez's car.

In the published part of the opinion, we find no merit in defendant Valadez's contention that the trial court committed prejudicial error by admitting fingerprint evidence even though, according to him, the scientific community has rejected the reliability of fingerprint evidence. In the unpublished part of the opinion, we conclude that two restitution fines must be vacated but in every other respect find no prejudicial error.

FACTS

Early in the morning on September 20, 2009, Osvaldo Hernandez drove his friend Victor Arechiga to a gas station with a convenience store to purchase beer. He parked near the front of the store, and Arechiga went in to make the purchase. Arechiga left the store with two 30 packs of beer and may have said something to a couple of girls as he passed by them.

As Arechiga put the beer in the backseat of Hernandez's car, a group of Norteño gang members rushed the car. One of the men yelled, "Are you a scrap?," using a disrespectful term for Sureños, and someone took the beer

from the backseat. Meanwhile, the men began punching and kicking Hernandez as he sat in the driver's seat. Hernandez was not able to get out of the car because one of the men pushed against the driver's door. As Hernandez was being blocked from getting out of the car through the driver's door, someone entered the vehicle through the passenger side door and slashed Hernandez's cheek with a sharp object. It looked like his face was "split in half." After the slashing, the group of men fled.

Jennifer Hernandez, who is not related to Osvaldo Hernandez, was at the gas station when the attack took place. She saw a group of young men who were rambunctious and cocky, and she saw four or five men attacking the car that Hernandez was in.

Woodland Police Department detectives retrieved a surveillance video showing the attack at the gas station. In the video, which is grainy and pixelated, Arechiga is seen putting the beer in the backseat of the car, while Hernandez waits in the driver's seat. At least four men approach the car, chase off Arechiga, grab the beer from the backseat, punch and kick Hernandez, and flee. Specifically, a man is seen pushing the driver's door shut, with his hand on the driver's side window, to keep Hernandez in the car. Another man is seen entering the front seat through the passenger's side and making a motion toward Hernandez with his right hand.

Based on a tip from an anonymous caller, the detectives contacted defendant Rivas's probation officer, Mike Ha, and had him watch the video to see if he could identify anyone. After watching the video several times, Probation Officer Ha was able to identify defendant Rivas and another man in the video.

Osvaldo Hernandez identified defendant Rivas at trial as the one who slashed his face. And Jennifer Hernandez identified defendant Rivas as one of the men gathered in the rowdy and rambunctious group at the gas station.

Two days after the attack on Hernandez, a community service officer with the Woodland Police Department identified six latent fingerprints on Hernandez's car, including a print from the outside of the driver's side window.

In May 2010, fingerprint analysts from the California Department of Justice identified a palm print taken from the outside of the driver's side window of Hernandez's car as matching a known palm print from defendant Valadez.

Defendants Rivas and Valadez are Norteño criminal street gang members.

Additional facts are included in our discussion of defendants' contentions.

## PROCEDURE

In 2011, defendant Rivas and three other defendants were tried by jury for crimes committed during the attack on Hernandez. The jury convicted one defendant of battery with serious bodily injury, robbery, assault by means of force likely to produce great bodily injury, and participation in a criminal street gang, and the jury acquitted two defendants. However, as to defendant Rivas, the jury was unable to reach a verdict, and the court declared a mistrial.

In 2012, the prosecutor tried defendants Rivas and Valadez together. The jury convicted both defendants of aggravated mayhem (Pen. Code, § 205), assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)), and active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)). The jury found true allegations that defendant Rivas personally used a deadly weapon (Pen. Code, § 12022, subd. (b)(1)) and personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)) and that both defendants committed crimes on behalf of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)). The jury also convicted defendant Rivas of robbery, but it could not reach a verdict on the robbery count as to defendant Valadez.

The trial court sentenced defendant Rivas to state prison for an aggregate determinate term of 17 years and a consecutive indeterminate term of 15 years to life.

The trial court dismissed the robbery count against defendant Valadez and sentenced him to state prison for an aggregate determinate term of 10 years four months and a consecutive indeterminate term of seven years to life.

## DISCUSSION

### I

### *Fingerprint Evidence*

#### (Valadez only)

Defendant Valadez contends the trial court committed prejudicial error when it admitted fingerprint evidence connecting him to the crimes because the scientific community has rejected the reliability of fingerprint

evidence. The fingerprint evidence in this case was essential to the prosecution's case because the only two circumstances that connected defendant Valadez to the crimes were his membership in the same gang as the other assailants and the presence of his palm print on the victim's car. Specifically, defendant Valadez argues that (1) fingerprint identification has not been shown to be reliable and (2) there was no adequate foundation for the expert testimony given in this case that the latent print on the car was from defendant Valadez's palm. The contention is without merit because (1) fingerprint evidence is not so unreliable that it must be excluded and (2) the foundation laid for the fingerprint evidence in this case was sufficient.

### A. Procedural Background

Defendant Valadez filed a motion in limine to exclude fingerprint evidence at trial. He claimed that "[(1)] latent fingerprint identification evidence is subject to *Kelly*[1] admissibility requirements, [(2)] fingerprint identification evidence is no longer generally accepted in the scientific community, [and (3)] there is no generally accepted statement that can be made regarding the significance of a match between a latent fingerprint and a known print. . . ." In support of defendant Valadez's motion, he reviewed the history of fingerprint evidence in California courts and asserted that "[t]he unproven assumption that the fingerprint process is reliable can no longer be sustained." Defendant Valadez argued that fingerprint evidence is suspect because (1) there is no scientific research showing that no two individuals' fingerprints have the same ridge characteristics, which are the primary characteristics used to identify a person's fingerprint, and (2) there has been no proof that a fingerprint analyst can reliably identify a person by comparing a known fingerprint sample to a fingerprint that is subject to an "unknown degree of distortion and variability . . . ." Defendant Valadez also claimed that fingerprint evidence is unreliable because there has been no testing done in determining the reliability of fingerprint analysis, including development of statistical data and uniform standards.

Defense counsel told the court that the motion was based, "most fundamental[ly]," on the argument that "scientific evaluation of fingerprint evidence" was "undergoing radical changes." The trial court refused to hold an evidentiary hearing on fingerprint evidence. It noted that there is no requirement to hold a *Kelly* hearing because fingerprint analysis is not a novel scientific technique. The court said that if the fingerprint analyst was successfully qualified as an expert, the court would allow her to offer an opinion concerning whether defendant Valadez's palm print matched the one taken from the car and defense counsel could cross-examine on the foundation for that opinion.

---

[1] *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*).

At trial, the prosecution called Norma Vidales, a community services officer for the Woodland Police Department, to testify concerning fingerprint evidence that she collected. She had been doing crime scene investigations for eight years, including photography, fingerprinting, sketching, and other evidence collection. She described how a fingerprint is processed from a crime scene and sent to the California Department of Justice for analysis.

On September 22, 2009, two days after the assault on Hernandez, Vidales was sent to collect evidence from Hernandez's car. She took pictures of the car and lifted six fingerprints, one of which, People's exhibit No. 4, was from the exterior of the driver's side window.

The prosecution also called Elizabeth Troxel, an employee of the California Department of Justice, to testify as an expert on latent fingerprint analysis. Before the court qualified her as an expert, both the prosecutor and counsel for defendant Valadez questioned her concerning her training and experience. She had worked for the California Department of Justice for four years and, before that, for the Sacramento Police Department for 14 years. She completed various courses on crime scene investigation, including basic and advanced latent fingerprint comparisons. She has never done scholarly research on fingerprint analysis, but has read published studies on the subject. Her proficiency in properly comparing fingerprints is regularly tested. She is certified as a fingerprint analyst by the International Association for Identification. And she has done fingerprint comparisons "thousands or tens of thousands of times."

Defendant Valadez objected to her qualification as an expert in fingerprint analysis, but the trial court overruled the objection and allowed Troxel to give expert opinion testimony on latent fingerprint analysis.

In Troxel's experience, she has never seen two people have the same fingerprint or palm print.

Over an objection by defendant Valadez concerning the foundation for Troxel's knowledge, Troxel also testified that fingerprints are formed before birth and, except for growth, do not change. No two persons have ever been found to have the same fingerprint. Each is unique, based on the pattern and characteristics of the ridges in the fingerprint.

Troxel described the process used to identify an individual from a fingerprint. The method, identified in cases using the acronym ACE-V, includes analysis, comparison, evaluation, and verification. (*In re O.D.* (2013) 221 Cal.App.4th 1001, 1004 [164 Cal.Rptr.3d 578] (*O.D.*).) She testified that a print collected by an agency and sent to the California Department of Justice

is analyzed and scanned so that it can be digitally compared to fingerprints already in the computer system, which is known as the automated latent print system (ALPS). ALPS identifies possible matches, which the analyst then compares to the fingerprint taken from the crime scene to determine whether there is a match.

In this case, Troxel was not the original fingerprint analyst who compared the print taken from the exterior driver's side window (exhibit No. 4) with the print suggested by ALPS, which is a known palm print from defendant Valadez. Instead, she verified the work of another fingerprint analyst. She compared exhibit No. 4 with the known palm print of defendant Valadez and concluded, as had the other analyst, that they matched based on the characteristics of the prints. The print taken from the car and the known palm print of defendant Valadez had 32 characteristics in common, or four times the minimum standard for identifying a match. That standard, as set by the California Department of Justice, is eight characteristics in common.

Counsel for defendant Valadez questioned Troxel on what she knew about mistakes that may have been made in fingerprint identification in other jurisdictions. She was aware mistakes had been made, but very few.

In defendant Valadez's opening brief on appeal, he claims his trial counsel "tried to get Troxel to explain what she did to determine that Exhibit 4 was made by Mr. Valadez, but [Troxel] refused to say much more than that she had compared the prints." We disagree with defendant Valadez's characterization of the testimony. Counsel asked Troxel to hold up the two cards (exhibit No. 4 and the known palm print of defendant Valadez) for the jury to see. And counsel then asked Troxel to show the jury "where the match is." This simplistic question predictably elicited a bewildered response, "Where the match is?" Troxel noted that it would be impossible for the jury to see the characteristics of the prints on the cards because the cards were small and the jury was far away. She suggested, however, that the jury would be able to see the characteristics of the prints if they passed the cards around. There was no evasiveness or refusal in Troxel's answers.

### B.   *Law and Analysis*

#### 1.   *Reliability of Fingerprint Evidence*

We approach defendant Valadez's contention that fingerprint evidence must be excluded as unreliable with two separate, but complementary, lines of reasoning. First, we conclude, as did Division Four of the First Appellate District in *O.D.* (Humes, J.), that expert fingerprint evidence is not subject to a foundational hearing under *Kelly, supra*, 17 Cal.3d 24, because fingerprint

evidence is not a novel scientific technique and does not have a misleading aura of certainty. And second, we conclude, as did the Seventh Circuit Court of Appeals (Posner, J.) in *U.S. v. Herrera* (7th Cir. 2013) 704 F.3d 480 (*Herrera*), that fingerprint evidence, in general, is not so unreliable that it must be excluded.

In *O.D.*, the minor claimed fingerprint evidence should have been excluded under *Kelly* "because there was no longer 'general acceptance' of fingerprint comparison 'in the relevant scientific community.' ([*Kelly, supra*, 17 Cal.3d] at p. 30.)" (*O.D., supra*, 221 Cal.App.4th at p. 1004.) In support, the minor submitted a report of the National Academy of Sciences questioning the reliability of identification through fingerprint comparisons. The trial court took the motion to exclude the evidence under advisement, and the expert testified concerning the method of analysis, as well as the application of that analysis to the fingerprint evidence in question. (*Ibid.*) The expert "acknowledged that fingerprint comparison is 'subjective,' that there is no established error rate, and that no studies suggest that the process is infallible." (*Id.* at p. 1005.) At the close of evidence, the court denied the motion to exclude the fingerprint evidence and relied on it to find the minor had committed the alleged burglary. (*Ibid.*)

On appeal, the minor renewed the contention that the fingerprint evidence should have been excluded. In rejecting the contention, the *O.D.* court reviewed *Kelly* and its progeny and the admissibility of fingerprint evidence.

"In *Kelly*, the California Supreme Court adopted the rule of *Frye v. U.S.* (D.C. Cir. 1923) 54 App.D.C. 46 [293 F. 1013] (*Frye*) governing the admissibility of expert testimony that relies on 'a new scientific technique.' (*Kelly, supra*, 17 Cal.3d at p. 30.) When a party seeks to introduce evidence relying on a new scientific technique, *Kelly* requires the party to show 'general acceptance of the new technique in the relevant scientific community' as well as the witness's qualification as an expert and use of '[the] correct scientific procedures' in employing the technique. (*Kelly*, at p. 30.)" (*O.D., supra*, 221 Cal.App.4th at p. 1006, fn. omitted.)

"The primary purpose of the *Kelly* rule is 'to protect the jury from techniques which, though "new," novel, or "experimental," convey a " 'misleading aura of certainty.' " ' [Citation.] This danger arises when techniques 'seem scientific and infallible, but . . . actually are not.' [Citation.] The *Kelly* rule 'is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.' [Citation.] 'Because the inventions and discoveries which could be considered "scientific" have become virtually limitless,' the determination whether expert testimony relies on a

' "scientific technique" ' is made in light of this 'narrow "common sense" purpose' of protecting the trier of fact from techniques that misleadingly convey certainty. [Citation.] The *Kelly* rule is frequently inapplicable to expert testimony because the testimony is often neither based on a new scientific technique nor likely to convey an aura of certainty. '[A]bsent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly*[].' [Citation.]" (*O.D., supra,* 221 Cal.App.4th at pp. 1006–1007.)

In *O.D.*, the fingerprint analysts used the ACE-V method (analysis, comparison, evaluation, verification). (*O.D., supra,* 221 Cal.App.4th at p. 1004.) The *O.D.* court found that "the *Kelly* rule is inapplicable to the ACE-V method of fingerprint comparison because, regardless whether it is generally accepted, fingerprint comparison is not the type of scientific technique *Kelly* governs since it can easily be understood by nonexperts and is unlikely to convey a misleading aura of certainty. [Citation.]" (*Id.* at p. 1007.) "Our Supreme Court, in [*People v.*] *Venegas* [(1998) 18 Cal.4th 47 [74 Cal.Rptr.2d 262, 954 P.2d 525]], expressly distinguished DNA evidence, which is subject to *Kelly*, from '*fingerprint*, shoe track, bite mark, or ballistic comparisons, which [laypersons] essentially can see for themselves.' (*People v. Venegas, supra,* 18 Cal.4th at pp. 80–81, italics added.)" (*Ibid.*)

In *O.D.*, the fingerprint expert "testified that the process of comparing prints is a 'visual' one, and the juvenile court was able to see the palm prints being compared and observe their similarities. In addition, there was no suggestion that the prints were tampered with or altered. [Citations.]" (*O.D., supra,* 221 Cal.App.4th at p. 1007.)

Finally, the *O.D.* court wrote: "[The fingerprint expert's] testimony was particularly unlikely to convey a misleading aura of certainty because [she] openly acknowledged that fingerprint comparisons are inherently subjective and that no study establishes their infallibility. She also made clear that it was her opinion—not an established scientific fact—that the palm print [at the crime scene] matched [the minor's]. 'When a witness gives [her] personal opinion on the stand—even if [she] qualifies as an expert—[laypersons] may temper their acceptance of [her] testimony with a healthy skepticism born of their knowledge that all human beings are fallible.' [Citation.]" (*O.D., supra,* 221 Cal.App.4th at p. 1007.)

Based on this analysis, the *O.D.* court held that fingerprint evidence is admissible without a foundational hearing because "the comparison of fingerprints is not the type of 'scientific technique' that *Kelly* governs. [Citation.]" (*O.D., supra,* 221 Cal.App.4th at pp. 1007–1008.)

Citing the same National Academy of Sciences report as was cited by the minor in *O.D.*, as well as other related reports, to try to discredit fingerprint evidence, defendant Valadez claims that the present method of using latent fingerprints to identify perpetrators of crimes has not been shown to be reliable. In making this claim, defendant Valadez provides an essay on fingerprint analysis, citing the various reports which he maintains call into doubt the reliability of fingerprint analysis.

■ This approach is unavailing. As the *O.D.* court noted, fingerprint evidence is not subject to exclusion based on a challenge to its reliability because it is not a new scientific technique and it does not convey a misleading aura of certainty. (*O.D., supra*, 221 Cal.App.4th at pp. 1006–1007.) As the Supreme Court has held, the jury can observe the fingerprints and make its own comparison to determine for itself the similarities. (*Id.* at p. 1007; *People v. Venegas, supra*, 18 Cal.4th at pp. 80–81.)

A defendant may respond to fingerprint evidence by challenging the training of the fingerprint expert (which defendant Valadez did in this case), by challenging the process by which the fingerprint expert made the comparison (which defendant Valadez did in this case to some extent), or by showing that the fingerprints do not match, either by calling the defense's own expert or simply showing the jury where they do not match (which defendant Valadez apparently did not do here).

In his briefing on appeal, defendant Valadez avoids discussion of *Kelly*; instead, he asserts, generally, that fingerprint evidence is so unreliable that it does not meet the threshold of admissibility. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769–772 [149 Cal.Rptr.3d 614, 288 P.3d 1237] [trial courts play vital gatekeeping role to insure reliability of underlying conceptual or methodological basis of expert testimony].) We conclude that fingerprint evidence is sufficiently reliable to be admissible, as was found by the Seventh Circuit Court of Appeals in *Herrera*. We quote the *Herrera* decision at length in this regard because we find it persuasive:

"The . . . issue relating to the fingerprint evidence is whether [the fingerprints found on the evidence] were the defendant's. They were latent rather than patent fingerprints. Patent fingerprints are made by pressing a fingertip covered with ink on a white card or similar white surface, and are visible.[2] Latent fingerprints are prints, usually invisible, left on a smooth surface when a person touches it with a finger or fingers. Laboratory

---

[2] We recognize that other modern means of collecting a person's fingerprints are also used, such as digital scanning.

techniques are employed to make a latent fingerprint visible so that it can be compared with other fingerprints. The latent prints on the [evidence] in this case were found by a fingerprint examiner to match the defendant's patent prints made in the course of the criminal investigation, and the government therefore offered the match as evidence of the defendant's participation in the [crimes]. The defendant argues that methods of matching latent prints with other latent prints or with patent prints have not been shown to be reliable enough to be admissible as evidence under the standard for reliability set forth in [federal rules and decisions]." (*Herrera, supra*, 704 F.3d at pp. 483–484.)

■ "The [ACE-V] methodology requires recognizing and categorizing scores of distinctive features in the prints [citations], and it is the distinctiveness of these features, rather than the ACE-V method itself, that enables expert fingerprint examiners to match fingerprints with a high degree of confidence. That's not to say that fingerprint matching (especially when it involves latent fingerprints, as in this case) is as reliable as DNA evidence, for example. Forensic DNA analysis involves comparing a strand of DNA (the genetic code) from the suspect with a strand of DNA found at the crime scene. The comparison is done with scientific instruments and determines whether the segments are chemically identical. Errors are vanishingly rare provided that the strands of code are reasonably intact." (*Herrera, supra*, 704 F.3d at p. 485.)

"Chemical [DNA] tests can determine whether two alleles are identical, but a fingerprint analyst must visually recognize and classify the relevant details in the latent print—which is difficult if the print is incomplete or smudged. '[T]he assessment of latent prints from crime scenes is based largely on human interpretation. . . . [T]he process does not allow one to stipulate specific measurements in advance, as is done for a DNA analysis. Moreover, a small stretching of distance between two fingerprint features, or a twisting of angles, can result from either a difference between the fingers that left the prints or from distortions from the impression process.' [Citation.]

"Matching latent fingerprints is thus a bit like an opinion offered by an art expert asked whether an unsigned painting was painted by the known painter of another painting; he makes or rejects a match on the basis of visual evidence. Eyewitness evidence is similar. The eyewitness saw the perpetrator of a crime. His recollection of the perpetrator's appearance is analogous to a latent fingerprint. He sees the defendant at the trial—that sighting is analogous to a patent fingerprint. He is asked to match his recollection against the courtroom sighting—and he is allowed to testify that the defendant is the perpetrator, not just that there is a close resemblance. A lineup, whether photo or in-person, is a related method of adducing matching evidence, as is handwriting evidence.

"Matching evidence of the kinds that we've just described, including fingerprint evidence, is less rigorous than the kind of scientific matching involved in DNA evidence; eyewitness evidence is not scientific at all. But no one thinks that only scientific evidence may be used to convict or acquit a defendant. The increasingly well documented fallibility of eyewitness testimony, [citations], has not banished it from criminal trials. [Citation.]

■ "Evidence doesn't have to be infallible to be probative. Probability of guilt is a function of all the evidence in a case, and if items of evidence are independent of one another in the sense that the truth of any one item is not influenced by the truth of any other, the probability of guilt may be much higher if there is evidence from many independent sources (several eyewitnesses, an eyewitness plus fingerprints, etc.) than it would be were there only the evidence of one eyewitness, say." (*Herrera, supra*, 704 F.3d at pp. 485–486, italics omitted.)

"Fingerprint experts such as the government's witness in [*Herrera*]—who has been certified as a latent print examiner by the International Association for Identification, the foremost international fingerprint organization (there are only about 840 IAI-certified latent examiners in the world, out of 15,000 total examiners)—receive extensive training; and errors in fingerprint matching by expert examiners appear to be very rare. Of the first 194 prisoners in the United States exonerated by DNA evidence, none had been convicted on the basis of erroneous fingerprint matches, whereas 75 percent had been convicted on the basis of mistaken eyewitness identification. [Citation.] The probability of two people in the world having identical fingerprints is not known, but it appears to be extremely low. [Citations.] The great statistician Francis Galton estimated the probability as 1 in 64 billion. [Citations.] That was not an estimate of the probability of a mistaken matching of a latent to a patent or another latent fingerprint. Yet errors in such matching appear to be very rare, though the matching process is judgmental rather than scientifically rigorous because it depends on how readable the latent fingerprint is and also on how distorted a version of the person's patent fingerprint it is. Examiners' training includes instruction on how to determine whether a latent print contains enough detail to enable a reliable matching to another print. Ultimately the matching depends on 'subjective judgments by the examiner,' [citation], but responsible fingerprint matching is admissible evidence, in general and in this case." (*Herrera, supra*, 704 F.3d at pp. 486–487.)

The evidence in this case is similar to the evidence in *Herrera*. A print was collected from the victim's car, and a fingerprint analyst certified by the International Association for Identification determined that the collected print matched the known palm print of defendant Valadez. Based on the analysis from *Herrera*, we conclude that fingerprint evidence, in general, is sufficiently reliable to be admitted.

## 2. *Foundation for Expert Testimony in This Case*

Defendant Valadez contends that, even if the trial court did not abuse its discretion by not holding a hearing to determine whether fingerprint evidence is reliable, it abused its discretion by overruling defendant Valadez's objections, based on lack of foundation, to Troxel's testimony. He claims that she failed to establish any reasonable foundation for her opinion. We disagree, based largely on the discussion above.

Defendant Valadez's argument in this regard is as follows: "[T]he prosecution and Troxel failed to establish the foundation for Troxel's opinion that the latent palm print matched Mr. Valadez's palm print. Before she declared the prints a match she said virtually nothing about the basis for her finding, and afterward, even when pushed, she offered only generic testimony about looking at the prints side by side and noting generally similar characteristics between the two."

■ This argument is without merit. As discussed in the authorities reviewed above, fingerprint evidence involves no more than comparing latent prints (those found at the crime scene) with patent prints (previously collected). Troxel explained that she compared the characteristics of the prints and found that they matched. Because (1) fingerprint evidence, generally, is not so unreliable as to be inadmissible and (2) Troxel, a trained fingerprint analyst, explained the process she used in comparing the fingerprints and reaching her conclusion, the trial court did not abuse its discretion in overruling defendant Valadez's foundational objections. (See *People v. Smith* (2005) 35 Cal.4th 334, 357–358 [25 Cal.Rptr.3d 554, 107 P.3d 229] [no abuse of discretion to admit relevant expert testimony for which foundation laid].) As the trial court told counsel, defendant Valadez could attempt to impeach Troxel by questioning her about her qualifications and the comparison of these prints or by introducing testimony of a defense expert, but Troxel's testimony was nonetheless admissible.

### II–VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

As to defendant Rivas, the judgment is affirmed.

As to defendant Valadez, the restitution fines imposed upon revocation of probation in cases Nos. CRF 09-3023 and CRF 09-5199 are vacated. As

---

*See footnote, *ante*, page 967.

modified, the judgment as to defendant Valadez is affirmed. The trial court is directed to prepare an amended abstract of judgment and to send it to the Department of Corrections and Rehabilitation.

Raye, P. J., and Robie, J., concurred.

The petitions of all appellants for review by the Supreme Court were denied November 10, 2015, S228958.